# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **CHARMAINE CROCKETT** | **CIVIL ACTION** |
| **VERSUS** | **NO. 13-74-RLB** |
| **CAROLYN W. COLVIN,**<br>**ACTING COMMISSIONER**<br>**OF THE SOCIAL SECURITY**<br>**ADMINISTRATION** | |

## RULING ON SOCIAL SECURITY APPEAL

Plaintiff, Charmaine Crockett (Plaintiff), seeks judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) pursuant to 42 U.S.C. § 405(g) denying Plaintiff's application for a period of disability and disability insurance benefits. (R. Doc. 1).[1] Having found all of the procedural prerequisites met (Tr. 1-6), the Commissioner's determination is now ripe for review. *See* 42 U.S.C. § 405(g); 20 C.F.R. § 404.981 ("The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding unless you . . . file an action in Federal district court . . . ."). For the reasons given below, the Court **ORDERS** that the decision of the Commissioner is **AFFIRMED** and Plaintiff's appeal is **DISMISSED with prejudice**.

---

[1] References to documents filed in this case are designated by: (R. Doc. [docket entry number(s)] at [page number(s)]). Reference to the record of administrative proceedings filed in this case is designated by: (Tr. [page number(s)]).

## I. STANDARD OF REVIEW

This Court's review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Substantial evidence has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938) (defining "substantial evidence" in the context of the National Labor Relations Act, 29 U.S.C. § 160(e)). The Fifth Circuit has further held that substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but no substantial evidence will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quotations omitted). Conflicts in the evidence are for the Commissioner "and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). The Court may not reweigh the evidence, try the case de novo, or substitute its own judgment for that of the Commissioner even if it finds that the evidence preponderates against the Commissioner's decision. *See, e.g.*, *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994) ("This is so because substantial evidence is less than a preponderance but more than a scintilla."); *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988) ("we must carefully scrutinize the record to determine if, in fact, such evidence is present; at the same time, however, we may neither reweigh the evidence in the record nor substitute our judgment for the Secretary's"); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988) (same).

If the Commissioner's decision is supported by substantial evidence, then it is conclusive and must be upheld. *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000). If the Commissioner fails to apply the correct legal standards, or fails to provide a reviewing court with a sufficient basis to determine that the correct legal principles were followed, it is grounds for reversal. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987).

## II. ALJ'S DETERMINATION

In determining disability, the Commissioner (through an ALJ) works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant throughout the first four steps of this five-step process to prove disability. If the claimant is successful in sustaining his or her burden at each of the first four steps, the burden shifts to the Commissioner at step five. *See Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (explaining the five-step process). First, the claimant must prove he is not currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove his or her impairment is "severe" in that it "significantly limits your physical or mental ability to do basic work activities . . . ." 20 C.F.R. § 404.1520(c). At step three the ALJ must conclude the claimant is disabled if he proves that his or her impairments meet or are medically equivalent to one of the impairments contained in the Listing of Impairments. *See* 20 C.F.R. § 404.1520(d) (step three of sequential process); 20 C.F.R. pt. 404, subpt. P, app. 1 (Listing of Impairments). Fourth, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his or her past relevant work. 20 C.F.R. § 404.1520(f).

If the claimant is successful at all four of the preceding steps then the burden shifts to the Commissioner to prove, considering the claimant's residual functional capacity, age, education and past work experience, that he or she is capable of performing other work. 20 C.F.R §

3

404.1520(g)(1). If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove that he or she cannot, in fact, perform that work. *Muse*, 925 F.2d at 789.

Here, after reviewing the evidence contained in the administrative record (Tr. 30-33), the ALJ made the following determinations on January 23, 2012:

1. Plaintiff met the insured status requirements of the Social Security Act through December 31, 2011.

2. Plaintiff had engaged in substantial gainful activity since the alleged August 14, 2007 onset date; however, she did not engage in substantial gainful activity for the entire period at issue.

3. Plaintiff had the following severe impairments: sarcoidosis,[2] carpal tunnel syndrome, degenerative changes of the lumbar spine.

4. Plaintiff did not have an impairment that met or medically equaled a listing — specifically, Listing 1.04 (Disorders of the Spine) and Listing 3.02 (Chronic Pulmonary Insufficiency).

5. Plaintiff had the residual functional capacity (RFC) to perform light work that involves frequent, but not constant, fingering; and is free from excessive exposure to pulmonary irritants.

6. Plaintiff can perform her past relevant work as a cashier.

7. Plaintiff did not meet the Social Security Act's definition of disability at any time between August 14, 2007 (the alleged onset date), and September 16, 2011 (the decision date).

(Tr. 22-28).

---

[2] Sarcoidosis is a "systemic granulomatous disease of unknown cause, especially involving the lungs with resulting interstitial fibrosis, but also involving lymph nodes, skin, liver, spleen, eyes, phalangeal bones, and parotid glands; granulomas are composed of epithelioid and multinucleated giant cells with little or no necrosis." Thomas Stedman, *Stedman's Medical Dictionary* (*Stedman's*), 363870 (27th ed. 2000) (Sarcoidosis).

## III. DISCUSSION

Plaintiff's argument on appeal is limited to the ALJ's finding of the Plaintiff's RFC. Plaintiff argues that the ALJ "improperly rejected the treating physician's RFC of October 13, 2009, that the Claimant was unable to work" in favor of an October 9, 2007 opinion rendered by a non-treating consulting physician. (R. Doc. 27 at 3). The treating physician Plaintiff refers to is Dr. Marta Fechete. (Tr. 507). On October 13, 2009, Dr. Fechete wrote a letter explaining:

> Charmaine has a diagnosis of Sarcoidosis. She has been unable to work since 2007 due to generalized body aches, and especially arm and leg pains. She cannot hold objects for long periods of time as this type of activity exacerbates her pain. She was working as a truck driver, but now cannot hold the wheel of a vehicle for the 8 hrs per day that this job entails.
>
> Sarcoidosis also affects her lungs, and causes shortness of breath and consequently fatigue. Fatigue is a limiting factor for most types of employment.

(Tr. 507). Dr. Fechete's October 13, 2009 letter offers two types of opinions — the first is an opinion as to the ultimate issue of disability (Plaintiff "has been unable to work"), while the second is a statement of what Plaintiff is capable of doing despite her impairments. Dr. Fechete provided a second letter on June 6, 2011, which only provides an opinion as to the ultimate issue of disability. (Tr. 638) (5/19/11 is date "you believe patient was unable to work").[3] The Court will first address Dr. Fechete's opinion of Plaintiff's capabilities, addressed in her first letter on October 13, 2009, before turning to the Dr. Fechete's October 13, 2009 and June 6, 2011 opinions as to the ultimate issue of disability.[4]

---

[3] While Plaintiff appears to only challenge the rejection of Dr. Fechete's October 13, 2009 opinion of the ultimate issue of disability, Plaintiff later briefly mentions that the ALJ should have adopted both the October 13, 2009 and June 6, 2011 opinions that she is totally disabled. Therefore, the both opinions are discussed in this Ruling.

[4] Plaintiff's sole argument on appeal is limited to the ALJ's rejection of Dr. Fechete's October 13, 2009 and June 6, 2011 opinions. Plaintiff has not otherwise alleged that any objective evidence exists that would call the RFC into question.

5

### A. Dr. Fechete's October 13, 2009 Opinion of Plaintiff's Abilities and ALJ's RFC Determination

The ALJ rejected Dr. Fechete's opinion of Plaintiff's abilities for several reasons, all of which the Court's finds valid. First, the ALJ properly found Dr. Fechete did not qualify as a treating physician when she rendered this opinion on October 13, 2009 — the date of Plaintiff's initial visit. (Tr. 24). A physician qualifies as a treating source "if the claimant sees the physician 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical conditions.'" *Huet v. Astrue*, 375 F. App'x 373, 376 (5th Cir. 2010) (quoting 20 C.F.R. § 404.1502) (alteration in original). Generally, the "opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *see also* 20 C.F.R. § 404.1527(c)(1) (discussing different weights generally given to medical opinions).[5]

Here the ALJ properly found Dr. Fechete was not a "treating source" when rendering this opinion, because it was not based on Dr. Fechete's own familiarity with Plaintiff's impairments acquired through any ongoing treatment relationship with Plaintiff.[6] *See Clayborne v. Astrue*, 260 F. App'x 735, 737 (5th Cir. 2008) (doctor properly rejected as treating source where

---

[5] According to the Fifth Circuit's decision in *Newton*, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Newton*, 209 F.3d at 453. Those criteria provide that the ALJ consider: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence supporting the opinion; (4) consistency of the treating physician's opinion with the record as a whole; (5) whether the opinion is that of a specialist; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2).

[6] The ALJ points out (Tr. 25-26) that Dr. Fechete continued to treat Plaintiff after her initial appointment on October 13, 2009, and therefore later became a treating source. (Tr. 638) (began treating Plaintiff on October 13, 2009); (Tr. 25) (Discussing Dr. Fechete's October 13, 2009 opinion, the ALJ found: "To the extent Dr. Fechete's opinion pertains to the period prior to her treatment relationship with the claimant, her opinion is entitled to no weight in this matter."); (Tr. 26) (As for Dr. Fechete's later opinions, ALJ explained that "Dr. Fechete, whose earlier opinion has been discounted due to the lack of a treating relationship at the time, continued to treat the claimant . . . . By [June 6, 2011], Dr. Fechete is considered a treating source.").

"isolated visits" did not amount to an "ongoing treatment relationship" with doctor); *Hernandez v. Heckler*, 704 F.2d 857, 860-61 (5th Cir. 1983) (affirming ALJ's rejection of doctor's opinion of claimant's abilities and that claimant was totally disabled as opinion was given on plaintiff's second appointment and doctor, who only saw claimant twice in a 17-month period, was not a treating physician); *Taylor v. Astrue*, 245 F. App'x 387, 391 (5th Cir. 2007) ("[N]othing about Taylor's relationship with Dr. Weisberg establishes the 'longitudinal' pattern of care described in [the regulations]; Taylor's two visits to Dr. Weisberg, four years apart, are the sort of "individual examinations" that are distinguished . . . from the continuous care provided by a treating physician."). Because Dr. Fechete was not a treating source at the time, the ALJ was not required to give great weight to her opinion, or apply the factors outlined by the Fifth Circuit in *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

Second, the ALJ rejected Dr. Fechete's opinion because it referred to the claimant's ability to work "for a period of time beginning two years before Dr. Fechete ever treated the claimant." (Tr. 25) (ALJ's decision); (Tr. 507) (On October 13, 2009, Dr. Fechete reported that Plaintiff had been unable to work as of 2007.); (Tr. 638) (Dr. Fechete's records confirm that her treatment of Plaintiff began on October 13, 2009); *see Oldham v. Schweiker*, 660 F.2d 1078, 1086 (5th Cir. 1981) (Rejecting opinion as it was hard "to imagine how Dr. Harris could support his opinion with medical evidence [when] he never treated [claimant] during the year" he found claimant "became totally disabled. In fact, his opinion was offered subsequent to a period of almost three years in which he never saw claimant.").

Dr. Fechete's opinion, the ALJ reasoned, is not based on her own treatment and medical observations; rather, Dr. Fechete simply reiterates "the complaints the claimant had offered at the initial clinic visit." (Tr. 24). Indeed, Dr. Fechete's actual exam notes from October 13, 2009

7

confirm that her opinion of Plaintiff's abilities is merely a restatement of Plaintiff's own reported history and subjective complaints. (Tr. 539) (Plaintiff reported working as a truck driver, that her "arms and legs give out after holding things for prolonged periods," and her "whole body" aches.); (Tr. 507) (Dr. Fechete opined that Plaintiff can no longer work as a truck driver due to "generalized body aches, especially arm and leg pains. She cannot hold objects for long periods of time."). Therefore, Dr. Fechete's opinion was likewise properly rejected as it was not based on her "own knowledge" and "medical findings." SSR 96–5P, 1996 WL 374183, at *4. (A Medical Source Statement must be based on the source's own knowledge and medical findings); *see also Perez v. Barnhart*, 415 F.3d 457, 466 (5th Cir. 2005) ("The ALJ was therefore justified in giving little weight to Dr. Heinze's testimony because he did not perform any clinical examinations on Perez.").

Finally, the ALJ explained in detail that he discounted Dr. Fechete's opinion as inconsistent with the objective medical findings from the time period addressed in Dr. Fechete's October 13, 2009 letter (2007-2009), including the findings of Plaintiff's treating neurologist, Dr. Kevin Callerame. (Tr. 25) ("Dr. Callerame's opinion is given greater weight, as he actually provided treatment for the claimant during the period Dr. Fechete is [*sic*] addresses, whereas Dr. Fechete did not."). While the ALJ acknowledged Plaintiff's ongoing complaints of leg and arm pain, and difficulty holding objects, he found "the objective findings do not document the degree of limitation suggested by Dr. Fechete." (Tr. 25).

For example, an MRI of Plaintiff's brain, taken August 8, 2007 to determine the presence of any neurological dysfunction, was normal despite complaints of paresthesia on the right side of Plaintiff's face. (Tr. 409). Dr. Callerame's objective findings from his August 21, 2007 neurological evaluation indicated Plaintiff's impairments were less severe than she had

8

subjectively reported. (Tr. 389). Dr. Callerame assessed only "mild ptosis" on the right side of the face and "proximal muscle weakness of both the arms and the legs." (Tr. 389). Plaintiff's August 22, 2007 nerve conduction studies revealed facial nerve neuropathy on the right and mild right carpal tunnel syndrome. (Tr. 393, 395-407). On August 31, 2007, Dr. Callerame noted Plaintiff's cranial nerves II-XII[7] were normal, her facial strength was normal and symmetric, her facial sensation was intact. (Tr. 391). Plaintiff's motor exam of "the extremities reveal[ed] normal strength and normal tone. Reflexes [were] equal and symmetric. Gait [was] normal," as well. (Tr. 391). Dr. Callerame reported on October 19, 2007 that Plaintiff's "sarcoid," which caused "paresthesias of the face and some weakness" when she began treatment, had now "dramatically improved on steroids." (Tr. 480). An October 19, 2007 motor exam of Plaintiff's extremities likewise revealed normal strength, normal tone, normal gait, and reflexes that were equal and symmetric in all extremities. (Tr. 480). On January 22, 2008, Dr. Callerame reported Plaintiff was "doing wonderful on Neurontin and prednisone." (Tr. 470). Plaintiff's January 22, 2008 motor exam showed normal strength, normal tone and normal gait. (Tr. 470).

Dr. Callerame examined Plaintiff for the last time on March 5, 2008. (Tr. 24, 482). As the ALJ points out, Plaintiff presented with complaints of shortness of breath and weakness, which were inconsistent with Dr. Callerame's objective findings. (Tr. 24, 482). Upon examination, Dr. Callerame found Plaintiff's cranial nerves ii-xii were normal, motor strength was 5/5, senses were intact, reflexes were 2/4, and Plaintiff's gait and cerebellar exam were both normal, as well. (Tr. 482). At the end of his treatment notes, Dr. Callerame explained: "She also brought some paperwork over for disability that I will complete, but from a neurological

---

[7] The cranial nerves "provide motor and sensory function to the head and face, and autonomic innervation (for salivation, tearing, perspiration, and temperature control) and visceral sensation (for internal organs such as the intestines) elsewhere in the body. The cranial nerves can be injured singly or in various combinations." Steven J. Holtz, M.D., *Peripheral and Cranial Nerve Injury Due to Trauma*, 10 Am. Jur. Proof of Facts 3d 757 § 19 (1990).

9

standpoint, her exam at this point is normal." (Tr. 482). The disability forms referenced by Dr. Callerame are not in the record as they were never provided by Plaintiff. (Tr. 24). March 5, 2008 also appears to be the last time Plaintiff sought treatment from Dr. Callerame, despite his note that she return in 3 months as usual. (Tr. 482). Because Dr. Callerame's disability forms were not provided, and Plaintiff discontinued treatment with Dr. Callerame after March 5, 2008, the ALJ reasoned that "Dr. Callerame's opinion would not have helped the claimant's case." (Tr. 24).

A September 29, 2008 MRA of Plaintiff's brain showed "[p]osterior circulation was unremarkable of bilateral vertebral arteries. Basilar artery unremarkable. No PCOM visualized." (Tr. 586). Plaintiff's September 29, 2008 MRI of her brain also found "[n]ormal proximal intervascular flow voids . . . . Normal definition of gray-white matter" and "[d]iffusion scans [that were] unremarkable." (Tr. 587). Treatment notes from November 10, 2008 note Plaintiff's August 2008 MRA "read as normal," and that both her MRA and MRI from August 2008 were "unrevealing" despite complaints of right facial numbness and spasms, and right upper extremity spasms. (Tr. 555). Plaintiff again complained of facial numbness and facial twitching at her November 10, 2008 appointment. (Tr. 555). However, she had no new complaints and reported that her facial spasms occurred intermittently, and her facial twitching had "somewhat improved." (Tr. 555). Neurological examination showed Plaintiff's cranial nerves ii-xii were intact, with the exception of her "l[eft] smile;" her motor strength was 5/5; and her deep tendon reflexes were normal (2+). (Tr. 555). On August 11, 2008, Plaintiff complained of body aches, weakness and right facial numbness, yet examination revealed her cranial nerves were intact, her strength was intact throughout, and her deep tendon reflexes were normal (2+). (Tr. 559). December 2009 imaging of Plaintiff's right hip found her joint space was well maintained with

10

no fracture or dislocation. (Tr. 581). Overall, despite her complaints of hip pain, imaging revealed Plaintiff had a "[n]ormal right hip." (Tr. 581).

The ALJ also appropriately discredited Dr. Fechete's opinion as she was a family practitioner, and not a neurological specialist like Dr. Callerame. (Tr. 25) ("Further, Dr. Fechete is a family physician, while Dr. Callerame is a neurologist who was treating the claimant for her neurological complaints, including the carpal tunnel syndrome.").

Next the ALJ explained that Dr. Fechete's opinion about the impact of Plaintiff's "lung impairment on her functioning for the two-year period prior to the beginning of the treatment relationship," is likewise inconsistent with the relevant medical evidence from that time period. (Tr. 25). While the record documents a history of complaints of shortness of breath, the objective medical findings do not support the degree of pulmonary limitation assessed by Dr. Fechete. (Tr. 557, 558). For example, despite complaints of shortness of breath, examinations continuously revealed Plaintiff's lungs were clear and that she appeared to not be in any acute distress. (Tr. 475, 492, 557, 579, 583, 584). Plaintiff's August 14, 2007 chest x-ray showed "no evidence of active pulmonary disease" and a cardiac size that was "near the upper limit of normal." (Tr. 345). Other testing from the relevant period show Plaintiff's respiratory system was normal upon examination, and that her breathing was even and unlabored. (Tr. 339, 341). A November 13, 2008 pulmonary function study concluded: "Pulmonary Function Diagnosis: Mild Restriction; Moderately Severe Diffusion Defect." (Tr. 550-53). Imaging of Plaintiff's chest, also taken on November 13, 2008, found mild cardiomelagy, but Plaintiff's lungs were clear with no effusion. (Tr. 583). Plaintiff's October 1, 2008 CT scan of her chest revealed some abnormalities potentially related to sarcoidosis, but otherwise there was no evidence of an abnormal mass in the lungs, no evidence of axillary lymphadenopathy, and her adrenal glands

11

appeared normal. (Tr. 579). Moreover, as the ALJ noted, "[n]o pulmonary restrictions were placed on the claimant." (Tr. 25). Therefore, the ALJ appropriately rejected Dr. Fechete's October 13, 2009 opinion of Plaintiff's abilities as inconsistent with the objective medical findings between 2007 and 2009.

The 2007-2009 medical evidence not only supports the rejection of Dr. Fechete's October 13, 2009 opinion, that evidence — along with the later medical and other non-medical evidence in the record — likewise constitutes substantial evidence supporting the ALJ's RFC determination. Here, the ALJ found Plaintiff capable of performing light work that involves frequent, but not constant, fingering; and is free from excessive exposure to pulmonary irritants. (Tr. 23). Dr. Timothy Honigman, a non-examining consultant, also found Plaintiff capable of performing light work, limited only by the need to avoid exposure to pulmonary irritants. (Tr. 428-435). Dr. Honigman's RFC did not include any manipulative or fingering limitations like the RFC assessed by the ALJ. (Tr. 23, 431).

Plaintiff suggests the RFC assessment is not substantially supported, however, because the doctor rendering the opinion "accepted" by the ALJ, Dr. Timothy Honigman, was not "a treating or *even examining source*." (R. Doc. 27 at 3-4). Contrary to Plaintiff's allegations, the opinion of non-examining consultant, Dr. Honigman, was not the sole piece of evidence the ALJ relied upon in determining Plaintiff's RFC. The ALJ also did not wholly adopt Dr. Honigman's opinion, as Plaintiff suggests (R. Doc. 27 at 3-4). Dr. Honigman did not place any manipulative limitations on Plaintiff's ability to use her fingers. (Tr. 431). Rather, the ALJ considered all of the evidence, which included Dr. Honigman's medical source statement, and agreed with Dr.

Honigman's findings of light work and pulmonary exposure limitations, based on their congruence with the record.[8]

Moreover, Plaintiff incorrectly argues that Dr. Honigman's opinion is incorrect because he "failed to mention neuropathy found in the EMG found in the record at page 393." (R. Doc. 27 at 4); (Tr. 391) (there is no EMG found in the record at page 393); (Tr. 393) ("No EMG performed at patient's request" on August 21, 2007). Dr. Honigman explicitly refers to an EMG conducted on August 31, 2007, as well as Dr. Callerame's "[i]mpression" of "cranial neuropathy" throughout August of 2007. (Tr. 435).[9] Dr. Honigman not only recognized Plaintiff's neuropathy, his opinion is arguably more favorable as it was rendered before Plaintiff began to show dramatic neurological improvement from taking steroids like prednisone and neurotonin in 2008. (Tr. 470, 482) (dramatic neurological improvement in January and March of 2008); (Tr. 554) (November 5, 2008 – "Normal" nerve conduction study and EMG).

In addition to the evidence already discussed, the following evidence further supports the ALJ's finding that Plaintiff could perform light work that involves frequent, but not constant, fingering; and is free from excessive exposure to pulmonary irritants. (Tr. 23). January 27, 2011 radiological imaging of Plaintiff's lumbar spine showed "Tiny osteophytes projected anteriorly from the end plates of L3, 4, and 5" there were no signs of "disc narrowing, acute fracture or

---

[8] *See* Social Security Ruling 96-5P:

> Even though the adjudicator's RFC assessment may adopt the opinions in a medical source statement, they are not the same thing: A medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s).

SSR 96-5P, 1996 WL 374183, at *4 (July 2, 1996).

[9] Dr. Honigman also refers to Dr. Callerame's reports of "facial weakness and numbness," diagnosis of "sarcoidosis, mild ptosis, decreased sensation in [Plaintiff's] face, [and] mild weakness in [her] arms" and to August 21, 2007 MRI and CT scans of Plaintiff's brain. (Tr. 435) (Tr. 351, 389, 393, 395-407, 409).

sublaxation." (Tr. 572). A February 1, 2010 CT scan of Plaintiff's lumbar spine showed normal lumbar spine alignment with no fracture or prevertebral soft tissue abnormality (Tr. 578). There was only mild disc height reduction and bilateral facet atrophy at L5-S1; otherwise, the intervertebral disc spaces are well maintained and the sacroiliac joints are within normal limits." (Tr. 578). Plaintiff's February 1, 2010 CT scan showed minimal degenerative discopathy and facet arthropathy, but otherwise revealed a normal lumbar spine without evidence of fracture, sublaxation, neuroforaminal or spinal canal stenosis. (Tr. 578). Plaintiff's respiratory exam was normal on December 10, 2010. (Tr. 612). Imaging of Plaintiff's chest taken on March 13, 2010, in response to her continued complaints of shortness of breath, found Plaintiff's "Heart size is [in the] upper limits of normal. Lung fields are clear." (Tr. 574). In response to Plaintiff's complaints of headaches and left extremity numbness, a CT scan of Plaintiff's head was taken on March 13, 2010, which found: "The ventricles are nondilated. No edema, hemorrhage or mass effect is seen. No extraaxial fluid collection. Normal noncontrast CT brain." (Tr. 575). The discharge notes on Plaintiff's September 20, 2010 medical records advise Plaintiff that she may engage in activities "as tolerated" and do not otherwise limit her ability to engage in work-related activities. (Tr. 521). And so, the medical evidence is consistent with the RFC assessed by the ALJ.

Despite her alleged disability onset date of August 14, 2007, Plaintiff worked 30 to 40 hours a week as a city bus driver from July 5, 2010 until May 19, 2011. (Tr. 89). Notably, Plaintiff did not begin working on July 5, 2010 because of an improvement in her symptoms; rather, she explained her return to work was financially motivated. (Tr. 89-92) ("I only went back because I had got put out of my house. . . . I wasn't feeling better, but I have no other choice but to go to work. Like I said, I had gotten put out of my house."). *See Vaughan v.*

*Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (the ability to work while suffering from conditions alleged to be disabling is evidence that the conditions are not disabling); *Fraga v. Bowen*, 810 F.2d 1296, 1035 n.11 (5th Cir. 1987) (ability to work despite pre-existing impairment supports finding of not disabled).

Given the evidence contained in the record, the Court finds the ALJ's RFC assessment is supported by substantial evidence.

      **B.**      **Dr. Fechete's October 13, 2009 and June 6, 2011 Opinions of Total Disability**

On both October 13, 2009 and June 6, 2011 Dr. Fechete provided what could be construed as opinions that Plaintiff was either disabled or unable to work. (Tr. 507, 638). Regardless of whether Dr. Fechete was a treating source,[10] opinions on issues reserved to the Commissioner, like the ultimate issue of disability, are not medical opinions, as Plaintiff suggests. *See* 20 CFR § 404.1527(d) (an opinion from a medical source that a claimant is disabled is "not [a] medical opinion[]"); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) ("Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status."). A statement by a medical source that a claimant is "disabled" or "unable to work" does not require the Commissioner to find that claimant disabled and is entitled to no weight. *See Barajas v. Heckler*, 738 F.2d 641, 645 (5th Cir. 1984) ("A statement made by a treating physician that a claimant is disabled does not mean that the claimant is disabled for purposes of the Social Security Act . . . ."); 20 C.F.R. § 404.1527(d)(3) ("We will not give any

---

[10] Dr. Fechete continued to treat Plaintiff after her initial appointment on October 13, 2009, and therefore later became a treating source. (Tr. 638) (began treating Plaintiff on October 13, 2009); (Tr. 25) (Discussing Dr. Fechete's October 13, 2009 opinion, the ALJ found: "To the extent Dr. Fechete's opinion pertains to the period prior to her treatment relationship with the claimant, her opinion is entitled to no weight in this matter."); (Tr. 26) (As for Dr. Fechete's later opinions, ALJ explained that "Dr. Fechete, whose earlier opinion has been discounted due to the lack of a treating relationship at the time, continued to treat the claimant . . . . By [June 6, 2011], Dr. Fechete is considered a treating source.").

special significance to the source of an opinion on issues reserved to the Commissioner . . . .").
Therefore, the ALJ properly rejected Dr. Fechete's opinions as to the ultimate issue of disability
— a decision reserved to the Commissioner.

**IV. CONCLUSION**

For the reasons given above, **IT IS ORDERED** that the Commissioner's decision is **AFFIRMED** and Plaintiff's appeal is **DISMISSED with prejudice**.

Signed in Baton Rouge, Louisiana, on September 19, 2014.

     **RICHARD L. BOURGEOIS, JR.**
     **UNITED STATES MAGISTRATE JUDGE**